1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17

| | |
|---|---|
| RAUL ARELLANO, CDCR #AH-1995, <div align="right">Arellano,</div> vs. A. CALDERON; MORENO, <div align="right">Defendants.</div> | Case No.: 22-CV-441 TWR (LR) **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (ECF No. 29) |

18
19

Presently before the Court is Defendants Calderon and Moreno's Motion for

20

Summary Judgment. (*See* ECF No. 29, "Mot. for Summ. J."). Plaintiff Raul Arellano,

21

currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego,

22

California, and proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983,

23

on April 4, 2022. (*See* Compl., ECF No. 1.)[1] Arellano claims Defendants, RJD mental

24
25
26

[1] Throughout this Order and for ease of consistency and reference, the Court will cite to

27

each document in the record using both the number assigned to the document and the page

28

number automatically generated by its Case Management/Electronic Case File system ("ECF").

1

health personnel, violated his Eighth Amendment rights by failing to provide him with adequate mental health care.  (*See generally id.*)  On May 25, 2023, Defendants filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  The Court has provided Arellano with notice of the requirements for opposing summary judgment as required by *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc).  (*See generally* ECF No. 30.)  Arellano filed his Opposition on November 22, 2023 (ECF No. 47, "Opp'n"), and Defendants filed their Reply on December 6, 2023 (ECF No. 50, "Reply.")

Having now carefully considered the full record and relevant law, the Court finds Defendants are entitled to judgment as a matter of law with respect to Arellano's Eighth Amendment claims, and **GRANTS** Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

As an initial matter, the Court addresses Plaintiff's request to consider his Complaint, the operative pleading in this matter, as a "verified complaint" and to consider the Complaint as evidence in opposition to Defendants' Motion.  (*See* Opp'n, ECF No. 47 at 2.)

## PLAINTIFF'S REQUEST TO VERIFY COMPLAINT

Plaintiff concedes he neither verified his April 4, 2022 Complaint nor sought leave to amend his Complaint at any time since April of 2022.  (*See id*.)  At no time until he filed his Opposition in late November of 2023 did Plaintiff seek to verify his Complaint.  For these reasons, the Court **DENIES** Plaintiff's request to retroactively verify his Complaint and finds that the Complaint is not admissible evidence at this stage of the proceedings. *See Moran v. Seligi,* 447 F.3d 748, 759-60 & n. 16 (9th Cir. 2006) (a complaint "cannot be considered as evidence at the summary judgment stage because it is unverified.").  The Court will, however, reference allegations contained in the Complaint for context.

/ / /

/ / /

/ / /

**EVIDENTIARY OBJECTIONS**

Plaintiff also objects to Exhibit D attached to the declaration of Jennifer Burns.  (*See* Burns Decl., ECF No. 29-4).  Exhibit D is the California Department of Corrections and Rehabilitation's ("CDCR") confidential chrono summarizing an interview of Plaintiff concerning his safety and enemy concerns.  (*See id*. at 36-37.)  Plaintiff objects to Exhibit D on the grounds that there is no declaration from the person who wrote this chrono and it is hearsay.  (*See* Opp'n at 5.)

At the summary judgment stage, the Court does not need to focus on whether the parties have submitted evidence in an admissible form.  Instead, the Court focuses on the admissibility of its contents and asks whether the evidence "could be presented in an admissible form at trial."  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.").  A "proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002).

Here, the Court finds there are enough contextual clues on the face of Exhibit D to conclude the document is what it purports to be.  *See* Fed. R. Evid. 901(b)(4) (evidence may be authenticated by "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."); *see also Johnson v. Sweeney*, No. 114-CV-1526-LJO-SAB, 2015 WL 6082061, at *9 (E.D. Cal. Oct. 13, 2015), report and recommendation adopted sub nom. *Johnson v. Sweeney*, No. 114-CV-1526-DAD-SAB, 2016 WL 8731209 (E.D. Cal. July 29, 2016) ("Courts generally view objections based on authentication skeptically in the absence of an indication that the document's authenticity is genuinely in dispute, and objections to prison records which are

clearly what they purport to be are routinely overruled under Rule 901(b)(4)[.]") (internal citations omitted).

Plaintiff's objections to Exhibit D on hearsay grounds are similarly unpersuasive. The CDCR memorandum is a business record. *See* Fed. R. Evid. 801(d)(2). The fact that Defendants did not submit a Custodian of Records' declaration is not fatal to its admissibility at this stage of the case. *See JL Bev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial."). The Court is satisfied that Exhibit D could be introduced at trial consistent with the Federal Rules of Evidence.

For these reasons, the Court **OVERRULES** Plaintiff's objections to Exhibit D of Burns' declaration**.**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    FACTS

#### *A.    CDCR Mental Health Treatment Programs*

Defendants, Calderon and Moreno, are psychologists employed by the California Department of Corrections and Rehabilitation ("CDCR") who were assigned to RJD. (*See* Defs.' Sep. Stmt. of Material Facts in Supp. of Mtn. for Summ. J. (hereinafter "SSMF"), ECF No. 29-3, ¶ 2.)   The CDCR provides mental health treatment to inmates at three different levels.   The Correctional Clinical Case Management System (CCCMS) is for inmates who have either a serious mental health diagnosis, or mild to moderate functional impairment.   The Enhanced Outpatient Program (EOP) is for inmates who have the same qualifying criteria as those at the CCCMS level of care, but the resulting functional impairment is more severe and requires more frequent contact with mental health professionals.   (*See id.* at ¶ 4.)   Finally, the Mental Health Crisis Bed (MHCB or "crisis bed") is for inmates "whose acute psychiatric systems cause them to be a danger to themselves or other or who suffer a grave disability, meaning the inmate is incapable of caring for himself safely."   (*Id.* at ¶ 7.)

Inmates at the CCCMS level of care receive individual contacts with either a psychologist or social worker every 90 days, individual contact with a psychiatrist every 90 days, and an interdisciplinary treatment teams (IDTT) meeting annually.  (*See id*. at ¶ 5.)  Inmates at the EOP level of care receive monthly contacts with a psychiatrist, weekly visits with either a social worker or psychologist, and an IDTT meeting every ninety days.  (*See id.* at ¶ 6.)  Finally, inmates at MHCB level of care are admitted to the MHCB to receive "intensive medical and mental health treatment from a variety of providers for the duration of their admission." (*Id*. at ¶ 8.)  During the duration of time an inmate is admitted to the MCHB a "Suicide Risk and Self-Harm Evaluation" is conducted "numerous times." (*Id*.)  "Clinicians assess the inmate-patient's current presentation, verbal and non-verbal indicators of distress, and the extent to which they articulate future plans and anticipated future consequences." (*Id*.)

### B.    Overview of Plaintiff's Crisis Bed Admissions from March to April 2018

Plaintiff was housed in RJD's sensitive needs yard from March 11, 2015 to March 14, 2018, where he was receiving care at the EOP level.  (*See id.* at ¶ 9.)  His level of care and corresponding housing assignments were then changed relevant to the instant action before this Court as follows:

| Date | Level of Care |
|------|---------------|
| March 14, 2018, to March 24, 2018 | CCCMS |
| March 24, 2018, to April 4, 2018 | MHCB |
| April 4, 2018, to April 6, 2018 | Discharged to Administrative Segregation and then returned to CCCMS |
| April 6, 2018, to April 19, 2018 | MHCB |
| April 19, 2018, to present | CCCMS |

(*See* Defs.' Mem. P. & A. Supp. Mot. for Summ. J. (hereinafter "Defs.' Memo P&As"), ECF No. 29-1, at 9.)  Plaintiff has not returned to the MHCB since these two admissions and has remained at the CCCMS level of care.  (*See id*.)

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.   Arellano's Mental Health Treatment – March 2018 to April 2018[2]

As set forth above, Plaintiff was housed on the EOP yard from March 11, 2015, to March 14, 2018, when he was transferred to CCCMS.  (*See* SSMF at ¶ 9.)  Ten days later, on March 24, 2018, Plaintiff reported feeling suicidal to a corrections officer and was admitted to the MHCB.  (*See* SSMF at ¶ 15; Decl. of A. Moreno (hereafter "Moreno Decl."), ECF No. 29-5 at ¶ 14.)  Dr. Moreno was assigned as his primary clinician, and Plaintiff was under a one-on-one suicide observation for the first twenty-four hours.  (*See id.*)  Thereafter, Plaintiff was observed at least every fifteen minutes.  (*See id.*)  On March 25, 2018, Psychologist Reyes, who is not a defendant in this lawsuit, performed a Suicide Risk and Self-Harm Evaluation, which notes that Plaintiff stated that he tried to hang himself in his cell on March 24, 2018, but stopped and reported his suicidal ideation to a corrections officer.  (*See* SSMF ¶ 16; Moreno Decl. at ¶ 15, Ex. A at 14-18.)  Dr. Reyes noted several factors that mitigate the risk of a patient's suicidality, also known as "protective" or "buffer" factors which included noting Plaintiff was "future- and goal-oriented and had significant family support, including his children."  (*See* Moreno Decl. at ¶ 15, Ex. A at 16.)  Plaintiff notes that Dr. Reyes's evaluation also documented his reports of suicidal thoughts and plans to kill himself over several years.  (*See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 47 ("Opp'n") at 2 (citing Moreno Decl., Ex. A at 14-18).)

On March 26, 2018, after reporting intermittent suicidal ideation to registered nurses in another suicide risk assessment, (*see* Moreno Decl., Ex. A at 110), Psychiatrist Toohey noted that Plaintiff reported feeling depressed "after learning that his [eleven-year-old son] had a suicide attempt and was hospitalized on a psych unit.  The son's mother blames [Plaintiff's] absence due to incarceration as contributing factor and places blame on [Plaintiff].  [Plaintiff] felt depressed about this . . . [Plaintiff] states he told custody that he

---

[2] These facts are taken from Defendants' SSMF, *see* ECF No. 29-3 along with the declarations and exhibits attached to their Motion, and the Court will note when Plaintiff disputes any of these facts or evidence set forth by Defendants.

was feeling suicidal but when they told him to wait overnight to generate paperwork, he tied a cable and contemplated suicide." (*Id*. at 169.)  In another assessment on that same day, Psychologist Elloyan noted that "[Plaintiff] is new admission to the MHCB following self-reported suicide attempt by hanging, though there is no objective proof of his account. He currently reports [suicidal ideation] but no plan or intent." (*Id*. at 177; *see also* SSMF at ¶ 18.)  In a "Suicide and Self-Harm Summary" completed on the same day and cited by Plaintiff in his opposition, Dr. Elloyan noted that Plaintiff claimed to have attempted suicide on four occasions but he could not recall the events of March 14, 2018 other than attempting to put a chord around his neck but did not follow through with the attempt because his cellmate woke up and used the bathroom. (*See* ECF No. 47-2 at 7.)  Plaintiff also reported that he told an unnamed sergeant the next day that he was feeling suicidal but "no one was listening." (*Id*.)  Dr. Elloyan also noted in the "History of Present Illness" section of her report: "Inconsistent reporting across documentation, flagged by Assessment Unit as evaluated for malingering." (Moreno Decl., Ex A at 177.)

The parties disagree as to whether the content of these reports demonstrate that Plaintiff tried to kill himself on March 24, 2018.  Defendants cite to Dr. Toohey's report, specifically the statement that Plaintiff "contemplated suicide," but never actually tried to carry out his plan to hang himself as evidence that Plaintiff recanted his statement that he attempted suicide. (*See* SSMF at ¶ 17.)  Meanwhile, Plaintiff contends that Dr. Toohey misinterpreted his statements as English is his second language, explaining that Dr. Elloyan's assessment is more accurate and actually demonstrates that he *did* attempt to commit suicide on the night of March 24, 2018. (*See* Opp'n at 2 ("As you can see, I tried killing myself by pulling the chord on my neck then I stop because my cellie woke up, I then thought about it [two] more times but didn't do it cause my cellie could [wake] up.").) Regardless of these disagreements, however, none of the Parties dispute that Plaintiff contemplated suicide on the night of March 24, 2018, and reported these feelings to a correctional officer.

Additional notes from Dr. Elloyan's assessment that day explained that Plaintiff was:

> alert, fully oriented, and made good eye-contact.  His thought
> process linear/logical/oriented . . . No delusions were observed
> or reported . . . endorsed SI but no plan or intent.  Affect did not
> match self-report.  When challenged with conflicting
> information previously reported, he appeared to stammer and
> struggle to explain why his report today was different.

(Moreno Decl., Ex. A at 126.)  An evaluation by Plaintiff's Interdisciplinary Treatment Team ("IDTT"), which included five mental health professionals, noted Plaintiff's reports of:

> Conflicting information from previous documentation, stated he
> has safety concerns "from the whole block", but states that he
> does have [suicidal ideation] and self-reported a suicide attempt
> on 3.24.18 in which he put a chord around his neck and pulled
> but heard cellie get up and took chord off neck, went back to
> sleep.  Stated he reported SI again in the morning.  No objective
> proof or collaboration of his account, no marks on neck
> reported.

(*Id*. at 164; *see also* SSMF at ¶ 20.)  Plaintiff explains that there were no marks on his neck because while he put the chord around his neck, he "didn't pull hard enough."  (Opp'n at 4.)  That evening, Plaintiff reported intermittent suicidal ideation, but refused to answer specific questions about "his suicidal ideation, possible plan, and reasons for feeling suicidal."  (Moreno Decl., Ex. A at 111.)  Plaintiff does not dispute that he refused to answer specific questions maintaining he did so because "it was registered nurses who are not mental health that were questioning me" and when he is feeling suicidal or depressed he does not "like to talk or be questioned."  (Opp'n at 4.)

On March 27, 2018, Plaintiff was removed from one-on-one observation in the MHCB and placed on an observation plan that involved checks by staff every fifteen minutes.  (*See* SSMF at ¶ 22.)  In an assessment that afternoon, Dr. Toohey noted: "[No] events overnight.  Patient refused to talk with clinician today, Too tired . . . Nursing state patient was observed in no acute distress earlier . . . MH tech observation notes that patient reported suicidal thoughts today.  No concerning activity."  (Moreno Decl., Ex. A at 188.)

Dr. Toohey also noted that Plaintiff's "current presentation was for [suicidal ideation] but no acute suicidality since admission," and that Plaintiff "still meets criteria for MHCB at this time." (*Id.* at 189.)

On March 28, 2018, Plaintiff met with Defendant Moreno in the MHCB for the first time, expressing interest in being placed in the EOP programming level. (*See* SSMF at ¶ 23.) Plaintiff reported to Defendant Moreno that he felt depression and anxiety about his inability to care for his family, his son attempting suicide due to his absence from his family, his habeas corpus case, and issues with his cellmates. (*See* Moreno Decl., Ex. A at 196-97.) The progress note by Defendant Moreno explains that:

> [Plaintiff] presenting increased stress related to recent change in LOC (EOP to CCCMS), self-reported [suicide attempt] of child, and continuing stress related to index crime. [Plaintiff] reports being able to cope previous to his LOC change. [Plaintiff] reports being interviewed by a Sgt about his safety concerns on the yard. Denies [suicidal/homicidal ideation].

(*Id.* at 197.) The March 28, 2018, note explains that Plaintiff would continue to be monitored for suicidal ideation. (*See id.*)

Plaintiff contends that he told Dr. Moreno he was still feeling suicidal and that she "purposely failed to note" these reports in the March 28, 2018 note. (*See* Opp'n at 4.) Citing to notes from Certified Nursing Assistants who monitored him during his checks at fifteen-minute intervals that day, Plaintiff notes that mental health professionals frequently observed him with his head covered in bed, where he contends he was actively planning suicide. (*See id.* at 4 (citing ECF No. 47-4 at 49-54; ECF No. 47-5 at 1-10).)

That same day, Plaintiff met with a correctional officer about his safety and enemy concerns in his permanent housing assignment outside of the MHCB. (*See* ECF No. 29-4, Burns Decl., Ex. D at 36-37.) A report drafted by an unnamed officer explains that during the interview, Plaintiff said that he did not have safety concerns, but that "'I said I was suicidal (MHCB) so I can go back to the EOP (Enhanced Outpatient Program) program. It's easier there.'" (*Id.*) When the officer confronted Plaintiff about willfully manipulating

9

his level of care to obtain more favorable programming, Plaintiff stated "'Well, this is what all the other inmates do.  Everyone knows that.  I have to do it so I get back to EOP.'"  (*Id*.)  While as noted above, Plaintiff objects to this report's consideration as evidence in support of Defendants' motion for summary judgment as inadmissible hearsay but he does not otherwise dispute that the officer told him that he was purposely manipulating his level of care or that he told the officer he wanted to be placed in EOP programming for reasons related to his safety and level of care.  (*See* Opp'n at 5.)

On March 29, 2018 a progress note authored by Dr. Moreno explains:

> [Plaintiff] reports depressed mood has improved somewhat, rating current depression as 6.5/10.  [Plaintiff] reports still having some paranoia about others out to harm him however "it's better when I don't have a cellie."  [Plaintiff] reports attempting some coping skills . . . [Plaintiff] reports continuing to work on his legal work and his next court date being on April 6.  [Plaintiff] reports some distress and denies [suicidal ideation/homicidal ideation].

(*See* Moreno Decl., Ex. A at 195.)  Dr. Moreno noted that Plaintiff had "some improved mood . . . is future oriented going to his next court date and has protective factor of his son . . . has been engaging in healthy coping skills and continues to improve . . . PC continues review protective factors . . ."  (*Id*.)  Finally, Dr. Moreno noted "[p]ossible DC early next week as sx's are starting to improve," but that Plaintiff would "continue to be seen daily by MH staff."  (*Id*.)

Plaintiff contends that he "never denied suicidal ideation.  I maintain such symptom every day.  And told them I couldn't trust myself."  (Opp'n at 5.)  Citing to additional precaution notes by Certified Nursing Assistants on the day of March 29, 2018, that show him lying down with his head covered, Plaintiff contends that this is "one way to know [I] am still contemplating suicide[] or plan[n]ing it*.*"  (*Id*. (citing ECF No. 47-5 at 12-31).)

On March 30, 2018, Psychiatrist Buabeng noted that Plaintiff "had a linear and logical thought process at times," and that his "[t]hought content is negative for suicidal ideation while here at crisis bed."  (Moreno Decl., Ex. A at 18.)  Dr. Buabeng further noted

10

that Plaintiff "feels safe here at crisis bed. Does not want to go to yard[,]" and that "[Plaintiff's] presentation during encounters, and reports of [his] behavior by custody, do not align with the sx that he is reporting. [Plaintiff] endorses symptoms that seem to be driven by secondary gain." (*Id*. at 20.) Dr. Moreno also met with Plaintiff that day, noting that he was future oriented and wanted to see his family after he paroles, and that Plaintiff denied suicidal or homicidal ideation. (*Id*. at 190-91.) Additionally, Dr. Moreno noted that Plaintiff's:

> mood appears to be improving and [he] has been processing about his current stressors. [Plaintiff] appears to be wanting more support (as he was [previously] moved from EOP to CCCMS) and was asking about EOP program again. PC encouraged [Plaintiff] to attempt to continue to boost his coping skills as mood has been improving. It is suspected that [Plaintiff] may be either trying to attempt to obtain a housing change or LOC change as [Plaintiff] reported hearing AH at CCCMS LOC only and has never heard AH when at EOP LOC.

(*Id*. at 191-92.) In response, Plaintiff contends "I don't know why Dr. Moreno will write I don't have [suicidal ideation] and that my situation is improving." (Opp'n at 6.) Instead, Plaintiff contends that he actually told Dr. Moreno "what she wrote on her report when she stated that I told her, 'It's my situation I can't handle.'" (*Id*.) Plaintiff also contends that he asked for EOP because of his "suicidal thoughts that I know I'll act [on] if [I go] back to yard where there's razors and [I] am not being watch[ed]," and that "in general I have and get more attention when I need it [in EOP]. And you'[re] not locked in your cell 24hrs as how in CCCMS which allow[s] me time to plan suicide[e]." (*Id*. at 6, 7.)

On March 31, 2018, Psychologist Contreras noted that Plaintiff did not report any suicidal ideation and exhibited no suicidal or self-harming behavior. (*See* SSMF at ¶ 28; Moreno Decl., Ex. A at 187-88.) Psychologist Hood met with Plaintiff on April 1, 2018, noting that "he struggles with being moved from EOP to CCCMS LOC when he was on the yard," and that he "'went downhill'" within two weeks from the last time he was moved to CCCMS. (*Id*. at 180.) Dr. Hood also reported that Plaintiff "asked for a pencil, paper,

and some envelopes to write family." (*Id.*)  Plaintiff contends that he later told Dr. Moreno that he requested pencil and paper from Dr. Hood "because I was planning to hurt myself." (Opp'n at 7.)

On April 2, 2018, Plaintiff reported feeling depressed and stressed about the impact being in prison had on his family to Dr. Toohey.  (*See* Moreno Decl., Ex. A at 184.)  Dr. Toohey noted that despite these reports, Plaintiff "was smiling and joking with staff intermittently during interview," and that Plaintiff "would like to be placed on EOP again leaving [sic] that [] the encouragement to go to groups was helpful for him.  Depression still seen as reaction to real stressor . . ." (*Id.*)  Plaintiff notes that "even though Toohey didn't mention [it]," he reported suicidal ideation to Psychologist Bailis on that day as well. (*See* Opp'n at 7 (citing ECF No. 47-1 at 83).)

Plaintiff met with his IDTT on April 2, 2018 to discuss his appropriate level of care. (*See* Moreno Decl., Ex. A at 152-161.)  Plaintiff told the IDTT that he needed to return to the EOP level of care because "custody comes to the door to remind us of groups in EOP and that gives me the motivation to get up and go … otherwise the spiderweb just holds me down in my cell all day." (*Id.* at 161.)  However, the IDTT determined that he did not need EOP level of care and noted that Plaintiff was "intelligent, future oriented, [and] independently work[ed] on his legal case effectively." (*Id.*)  In addition, in determining that Plaintiff no longer needed EOP level of care, the IDTT found that "[s]ince participating in EOP program, [Plaintiff] has likely gained additional coping skills and increased adaptive strengths likely leading to resolution of [symptoms]." (*Id.*)

The following day, on April 3, 2018, Defendant Moreno met with Plaintiff and Plaintiff informed him that he had "ongoing stress related to his legal work however no issues with depression" and denied suicidal ideation. (*Id.* at 190.)  Defendant Moreno informed Plaintiff that he had "met all [treatment] goals" and was expected to transfer to CCCMS the following day. (*Id.* at 191.)  He further recommended that Plaintiff be seen once a week during his first month back in CCCMS care and that he be "educated about groups and programs available to CCCMS [inmates]." (*Id.*)  Plaintiff contends that every

time he saw Defendant Moreno he "told her [he] was feeling suicidal and that he want[ed] to kill [himself] to eliminate the loneliness and pain of being without [his] family." (Opp'n at 8.)  Plaintiff claims he told Defendant Moreno that he did not "trust myself, I will attempt to kill myself either by hanging or slicing my wrists" and razors are available to inmates housed in CCCMS level of care.  (*Id*. at 9.)

Later that night, after learning he would be transferred to CCCMS, Plaintiff reported "intermittent" suicidal ideation to a nurse at 10:06 p.m.  (Moreno Decl., Ex. A at 104.)  Psychiatrist Umugbe responded to this report and noted the Plaintiff reported that he "want[ed] to end his life by hanging" and noted the same concerns that Plaintiff had expressed to other mental health providers.  (*Id*. at 183.)  Dr. Umugbe placed Plaintiff on a one-to-one suicide watch. (*See id*.)

The following day, Plaintiff met again with his IDTT, which included Defendant Moreno, for an "extensive interview and review of his mental status."  (SSMF at ¶ 34, Moreno Decl., Ex. A at 139-151.)  The IDTT found that while Plaintiff "often reported still feeling suicidal," he also stated that "I want to see my family" and "I need to live for my family" which the IDTT found to be "clearly future thinking."  (*Id.* at ¶ 34, Moreno Decl., Ex. A at 151.)  Plaintiff also told the IDTT "I can't go to [administrative segregation], I need phone calls to my family."  (*Id*.)  The IDTT found that while Plaintiff did not want to be transferred to CCCMS, it was "clear that [Plaintiff's] issues have remained chronic and could be treated at a lower [level of care]" and agreed to proceed with Plaintiff's transfer. (*Id*.)  Plaintiff maintains that Defendant Moreno is only "assuming" that his "acute suicidal claims were not true" because she has "no evidence that my acute suicidal claims were not true."  (Opp'n at 10.)

That same day, April 4, 2018, Defendant Moreno performed a "Suicide Risk and Self-Harm Evaluation" on Plaintiff.  (Moreno Decl., Ex. A at 117.)  Plaintiff informed Defendant Moreno that he "tried to hang himself on [March 24, 2018], despite no evidence of this" and he "later reported he didn't actually attempt, he just made the noose."  (*Id*.)  Plaintiff disagrees with this report and claims he told Defendant Moreno that he "pull[ed]

the noose while around my neck but stop[ped] cause my cellie woke up [and] then I thought about doing it twice but I didn't." (Opp'n at 10.)

After interviewing Plaintiff and reviewing his records, Defendant Moreno determined that Plaintiff "presented a moderate risk of suicidality." (SSMF at ¶ 36, Moreno Decl., Ex. A at 121.) She further determined that he was "no longer in crisis and the [treatment] team has agreed" to transfer Plaintiff back to CCCMS with "additional sessions for transition" from EOP to CCCMS. (Moreno Decl., Ex. A at 122.)

Plaintiff was ultimately discharged from the MHCB by Dr. Toohey. (SSMF at ¶ 37, Moreno Decl., Ex. A at 128-140.) Dr. Toohey reported that Plaintiff presented with suicidal ideation but "no acute suicidality since admission until he discover[ed] that he was being discharge[ed]." (Moreno Decl., Ex. A at 128.) Dr. Toohey also opined that Plaintiff's report of suicidal ideation "is highly suspicious of secondary gain (patient does not want discharge)." (*Id.* at 129.) He further noted Plaintiff's "mental status exam on interview is not consistent with depressive mood (smiling, joking with staff, future thinking)" and Plaintiff "demonstrated no suicidal behaviors or gestures during his [MHCB] stay or [in] the months prior." (*Id.*) Dr. Toohey ordered that Plaintiff be seen by a primary clinician daily for five days and by a psychiatrist within ninety (90) days "or sooner if necessary" upon his return to CCCMS. (*Id.* at 138-39.) Plaintiff denies that he did not want to be discharged from MHCB but rather he wanted to be transferred to the EOP level of care. (*See* Opp'n at 12.)

On April 5, 2018, Plaintiff met with Psychology Intern Johnson. (*See* SSMF at ¶ 41; Decl. of A. Calderon (hereafter "Calderon Decl."), Ex. A at 43.) Plaintiff "reported his anxiety and depression are both 9 on a scale of 1-10, with 10 being highest level." (Calderon Decl., Ex. A at 63.) Plaintiff was reported to have high levels of anxiety and depression but did not report suicidal ideation. (*See id.*) Johnson did not find Plaintiff to be in crisis and "that CCCMS is the appropriate level of care." (Calderon Decl. at ¶ 15; Ex. A at 47.) Plaintiff does not dispute Johnson's findings. (*See* Opp'n at 13.) However, Plaintiff claims that at some point on that day, "when no one was around," he "attempted

suicide by throwing himself from top bunk to concrete floor landing on side of head [and shoulders." (*Id.*)

Senior Psychologist Brown consulted with Plaintiff the following day on April 6, 2018. (*See* SSMF at ¶ 42; Calderon Decl., Ex. A. at 65.) Plaintiff reported to Brown that he was suicidal and "no longer felt safe to remain in his cell with all of his belongings because he did not know what he would do to himself." (Calderon Decl., Ex. A. at 65.) He further told Brown that "he rolled off the top bunk in his cell and hurt his head and shoulder, though he did not receive medical attention." (*Id.*) Brown reported that "[n]either of these behaviors could be corroborated with supporting documentation in the chart." (*Id.*) Plaintiff responded that he "felt frustrated with mental health not taking him seriously and he would do what was necessary to demonstrate his distress." (*Id.*) Dr. Brown opined that Plaintiff "can likely return to CCCMS if there is an adequate plan in place for him." (*Id.*)

Plaintiff was medically examined after his claims that he threw himself off his bunk. (*See* Calderon Decl., Ex. A at 18-19.) Dr. Goyal reported Plaintiff had a "normal neuro exam and does not have any red flags." (*Id.* at 2.) Plaintiff states in response that the doctor who examined him was "only looking for broken bones" but did not care about "all [his] other aching pains." (Opp'n at 13.)

Later that day, Psychologist Bailis performed a "Suicide Risk and Self Harm-Evaluation" on Plaintiff. (Calderon Decl. Ex. A at 74-76.) Dr. Bailis noted Plaintiff "appear[ed] motivated to return to EOP" and told her "I think I need to go back to EOP or a higher level of care." (*Id.* at 76.) Dr. Bailis found that Plaintiff's "depression was likely maintained by poor coping skills and maladaptive relational patterns" but since "participating in EOP program, [Plaintiff] has likely gained additional coping skills and increased adaptive strengths likely leading to resolution of [symptoms]." (*Id.* at 149.) Plaintiff argues in response that Dr. Bailis only "pasted the answers of what another psychologist put on the 'Suicide Risk and Self Harm Evaluation.'" (Opp'n at 14.)

Later that night, Plaintiff was seen by Psychiatrist Buabeng. (*See* Calderon Decl.

Ex. A at 129.)  Dr. Buabeng noted that Plaintiff had been recently discharged from a crisis bed and was "brought back today after reporting suicidal ideation without a specific plan." (*Id*. at 138.)  As part of the treatment plan, Dr. Buabeng noted "Safety: Continue 1:1 observation."  (*Id*.)

The following day, Plaintiff "reported no suicidal ideation and exhibited no suicidal or self-harming behavior."  (Calderon Decl. at ¶ 20, Ex. A. at 32-33.)  In addition, Plaintiff "continued to show linear and self-harming behavior."  (*Id*. at 40-41.)  Plaintiff disputes this indicating that it was noted that he was "refusing care, uncooperative, withdrawn." (Calderon Ex. A at 40.)  Plaintiff argues that just because he did not report suicidal ideation does not "mean [he] wasn't planning it, [be]cause he was."  (Opp'n at 14.)  Plaintiff later reported to Dr. Buabeng that he was "still having the thoughts, [he] has been trying to shake it off."  (Calderon Dec., Ex. A at 177.)

On April 8, 2018, Plaintiff did not report any suicidal ideation or self-harming behavior and was examined by Psychiatrist Contreras.  (*Id*. at 30-31, 175-77.)  Plaintiff informed Dr. Contreras that he was "alright" but did not want any changes to his medication.  (*Id*. at 176.)  Plaintiff claims that he was not examined by Dr. Contreras but he was sleeping.  (*See* Opp'n at 14.)  The medical records indicate that Dr. Contreras recorded that Plaintiff was "somewhat cooperative due to him still being sleeping this morning."  (Calderon Decl., Ex. A at 176.)

The following day, on April 9, 2018, Plaintiff was seen by Dr. Calderon.  (*Id*. at 65.) Plaintiff told Dr. Calderon that his medication was "not at all" working and his treatment was working "somewhat."  (*Id*.)  Plaintiff also reported that the "negative impact" of his death on his "loved ones" keeps him from killing himself and he feels "like I'm not ready to die for several reasons."  (*Id*. at 77.)  Plaintiff disputes this saying that he "actually told Calderon [he] constantly is think[ing] of suicide" and he "strongly feels like dying." (Opp'n at 15.)

Plaintiff also met with his IDTT, which included Dr. Calderon, on April 9, 2018. (Calderon Decl., Ex. A at 119-128.)  The team reported that Plaintiff's reports of suicidal

16

ideation were "vague and nonspecific." (Calderon Decl., Ex. A at 127.)  The team also concluded that he did not qualify for a higher level of care, and he was primarily in MHCB for "Ad Seg and safety reasons."  (*Id*.)

Plaintiff disputes this and claims that he told Dr. Calderon that he was "planning to hang [him]self, slice [his] wrist, or OD with pills" but these statements were "omitted [from] Calderon's report."  (Opp'n at 15.)  However, Dr. Toohey, another member of the IDTT, reported that Plaintiff was "joking and smiling with staff during IDTT."  (Calderon Decl., Ex. A at 172.)

Dr. Calderon attests that prior to his IDTT meeting on April 9, 2018, Plaintiff "did not report suicidal ideation, suicidal or self-harming behaviors, and talked 'happily' with his mental health observer."  (Calderon Decl. at ¶ 26.)  However, "after learning at his IDTT that he did not qualify for a higher level of care, [Plaintiff] reported constant suicidal ideation."  (*Id*.)  Plaintiff again disputes this and declares that he did report suicidal ideation on April 6 and April 7, 2018.  (*See* Opp'n at 15.)  However, Plaintiff does not dispute that he did not report any of these types of thoughts on April 9, 2018, prior to the IDTT meeting.

Dr. Calderon met with Plaintiff on April 10, 2018.  (*See* Calderon Decl. at ¶ 27.)  Dr. Calderon reported that Plaintiff said he was "not doing well" but his "reports were vague, and he appeared to be exaggerating his symptoms."  (Calderon Decl., Ex. A. at 190.)  Plaintiff also "perseverated on future-oriented tasks such as writing to the Innocence Project, speaking with his sons, and other legal issues due to his release in 2028."  (*Id*. at 190-191.)  Plaintiff also "appears to present himself in a distressed and depressed manner, although he does not appear depressed or endorsing symptoms commonly associated with depression."  (*Id*. at 191.)

Dr. Toohey met with Plaintiff on April 11, 2018, and noted that Plaintiff had "no thoughts of self-harm" and "remains in behavioral control."  (Calderon Decl. Ex. A. at 169.)  She further reported that "[[i]t remains our impression that, like previous crisis bed admission, patient has secondary gain in staying in crisis bed."  (*Id*. at 171.)

On April 12, 2018, a team of nine (9) psychiatrists and psychologists, including Dr.

Calderon, met for a case conference in which they discussed Plaintiff's level of care. (*See* Calderon Decl. at ¶ 29.)  It was discussed that Plaintiff reported he was feeling suicidal when he was discharged from MHCB but the "treatment team had doubts about the veracity of his claims and his need for inpatient treatment." (Calderon Decl., Ex. A. at 188.)  The team discussed Plaintiff's "recent background and possible motivations for seeking higher level of care." (*Id*.)  Specifically, they reviewed his desire to delay deadlines for "submissions accepted by the court," his desire for his one-to-one suicide watch to be monitored by female nurses," and that he wanted to be "in EOP because he would receive more clinical attention in general." (*Id*.)  However, Plaintiff was "unable to specify any aspect of the treatment itself that he found helpful." (*Id*.)  The "team was in agreement that [Plaintiff] did not require this level of care for a major mental illness" and "opted to discharge [Plaintiff] back to CCCMS." (*Id*. at 188-89.)  The team also discussed the discharge plan to include that Plaintiff "be seen with increased frequency (perhaps b-weekly) following completion of his 5-day follow up to provide additional support." (*Id*. at 189.)

Dr. Calderon met with Plaintiff on April 12, 2018, and reported that Plaintiff "appeared drowsy and reluctant to interact." (Calderon Decl., Ex. A at 184.)  Plaintiff "reported he was feeling fine and needed to sleep." (*Id*.)  Plaintiff disputes this and states that when he "told Calderon, [he] felt suicidal, he walked away." (Opp'n at 17.)  In addition, "later that on that night," Plaintiff claims he asked to have all items removed from his cell because his "anxiety is high." (*Id*.)

The next day, Plaintiff was given an additional dose of his anxiety medication. (*See* Calderon Decl., Ex. A at 162.)  Dr. Calderon met with Plaintiff later that day and reported he did report suicidal ideations the previous night but seemed "calm" and did not "appear depressed." (*Id*. at 180.)  Plaintiff told Dr. Calderon that he "'gave all my stuff back because [he] didn't want all these injuries'" while looking at his arms, but Dr. Calderon reports that "there was no visible scars or affected skin issues with his arms." (*Id*.)

Plaintiff was examined by Psychologist Hood on April 14, 2018. (*See* Calderon

Decl., Ex. A at 155-56.)  Dr. Hood found that Plaintiff "appeared stable with no acute signs of distress or de-compensation."  (*Id.* at 156.)  Plaintiff informed Dr. Hood that he had "more suicidal thoughts when I'm up at night" and Dr. Hood determined that Plaintiff should be housed in MHCB "at this time."  (*Id.*)

On April 16, 2018, Plaintiff was seen by Dr. Calderon, who reported that Plaintiff indicated that he "feel[s] like [he's] not ready to die for several reasons" and only had "passing thoughts of suicide."  (*Id.* at 77.)  However, shortly after this meeting Plaintiff "reported worsening suicidal ideation and impulses to cut himself and voluntarily returned paper in his possession because he stated he could use it to cut himself."  (Calderon Decl. at ¶ 35.)  Plaintiff was placed in "one-to-one observation for twenty-four hours."  *Id.*  In response, Plaintiff maintains that it is "evident Dr. Calderon and all the team are all liars, making misleading and prejudicial reports, putting life at risk."  (Opp'n at 19.)

Plaintiff met with his IDTT later that day.  (*See* Calderon Decl., Ex. A at 106-119.) The team agreed to change Plaintiff's anxiety medication but did not find that he qualified for a higher level of care.  (*See id.* at 118.)  They found despite Plaintiff reporting he had suicidal ideation, he also reported that he did not "actually harm himself, and thus, he could be transferred to CCCMS."  (*Id.* at 117-118.)  Plaintiff claims in response that the team as a whole played a limited role and "the only one making decisions and talking was Calderon."  (Opp'n at 19.)

After the IDTT meeting, Plaintiff met with Dr. Toohey and reported that he "thought of cutting but didn't."  (Calderon Decl., Ex. A at 166.)  Dr. Toohey reported Plaintiff agreed to a change in medication but asked if the medication would "prevent me from having babies in the future" and would it "turn [him] gay."  (*Id.*)

The following day, Plaintiff did not report suicidal ideation, nor did he exhibit any suicidal or self-harming behavior.  (*See id.* at 6, 147.)  Plaintiff was informed that he would be discharged from the crisis bed on April 19, 2018.  (*Id.*)  On April 18, 2018, Plaintiff was introduced to Social Worker Powers who told him that he needed to be placed in EOP because CCCMS does "not have enough care" for him.  (*Id.* at 197.)  However, Plaintiff

informed Powers that he was not currently experiencing suicidal thoughts.  (*See id*.)  Plaintiff disputes this by claiming that he told Powers that putting him CCCMS would put his life at risk because he had access to razors and "if [his] thoughts of suicide get severe, [he] will slice [his] wrist."  (Opp'n at 20-21.)  On that day, it was documented eight times that Plaintiff did not report suicidal ideation or self-harming behavior.  (*See* Calderon Decl., Ex. A at 21-22.)

On April 19, 2018, at 1:00 a.m., Plaintiff informed staff that he had "superficially cut his wrist with paper."  (*Id*. at 195.)  When asked to "describe what he was feeling when he engaged in this behavior," Plaintiff "expressed frustration towards members of his IDTT" and "insisted that he remain in EOP."  (*Id*.)  Dr. Calderon determined that this was not a suicide attempt because the cuts were superficial.  (*See* Calderon Decl. at ¶ 40, Ex. A at 160, 196-97.)

Later that day, Plaintiff informed Dr. Calderon that his medication was "somewhat" working and that he rarely thinks about suicide.  (Calderon Decl. at ¶ 41, Ex. A at 64, 76-77.)  Dr. Calderon administered a Suicide Risk and Self-Harm Evaluation.  (*See* Calderon Decl., Ex. A at 66-71.)  Plaintiff reported that he "does not get called to attend groups in C-yard as an CCCMS" but in "EOP, they come and get you."  (*Id*. at 66.)  He further reported that Plaintiff made "conditional threats toward the treatment team" and asked "'what if' he engages in self-injury," whether that would "warrant another MHCB admission."  (*Id*.)  Psych Tech Milan and Dr. Brown both indicated that they believed Plaintiff's "statements were threats to MHCB treatment team and were stated for manipulation reasons."  (*Id*.)  Plaintiff was also "overheard speaking loudly with his neighbor in cell 152 about how to get a higher level of care."  (*Id.* at 70.)

Plaintiff also met with his IDTT team on April 19, 2018.  (*See* Calderon Decl., Ex. A at 90-104.)  The team found that "despite the lack of certainty about [Plaintiff's] motivations for seeking out EOP and DSH, the team was in agreement that [Plaintiff] did not require this level of care for a major mental illness."  (*Id*. at 104.)

Dr. Jakobczuk met with Plaintiff after he was discharged from MHCB and found

Plaintiff to be "pleasant, calm and did not appear to be in any distress." (*Id.* at 178.) Plaintiff told Dr. Jakobczuk that he was in the "best [building] on C yard" and he received a cellmate who he was familiar with that "mak[es] his adjustment easier." (*Id.*)  He denied any "current desire or intent to kill himself." (*Id.*)  Every day for the following five days, Plaintiff was seen daily by mental health staff and did not exhibit signs of acute distress, but instead only reported "mild" suicidal thoughts on April 20, 2019.  (Calderon Decl. at ¶ 45, Ex. A at 42-62, 151.)

On April 22, 2018, Plaintiff reported to Dr. Tribble that he was "doing better in his new housing unit because he knows some inmates there and feels comfortable; as a result, he does not want to have his LOC changed to EOP." (Calderon Decl., Ex. A at 60.)

## II.  Legal Standard

A court may grant summary judgment when it is demonstrated that no genuine dispute exists regarding any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential

element of the non-moving party's claim.  *See Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Id.*  But if the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party.  *See Stegall v. Citadel Broad, Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, No. 11–09068, 2013 WL 1010547, *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").  A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50 (citation omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment.  *See Nissan Fire & Marine*, 210 F.3d at 1103.

## III.   Analysis

Drs. Moreno and Calderon seek summary judgment with respect to Arellano's Eighth Amendment inadequate mental health care claims because evidence in the record demonstrates that Plaintiff did not suffer from a serious mental health need and even if he

22

could show such a need, they were not deliberately indifferent to such needs because it was their professional opinion that Plaintiff was not actually suicidal or a danger to himself or others.  (*See* Defs.' Mem. of P&As at 16-20.)

Alternatively, Drs. Moreno and Calderon claim they are entitled to qualified immunity because Arellano does not have a clearly established right to a "higher level of mental health care following Defendants' clinical assessments that Arellano's supported suicidality was not genuine."  (*Id*. at 24-25.)

### A.  *Eighth Amendment Inadequate Mental Health Care Claims*

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and a failure to meet that obligation can violate the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976).  In order to prevail on an Eighth Amendment claim for inadequate medical care, however, a prisoner must show "deliberate indifference" to his "serious medical needs."  *Id.* at 104.  This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).  To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104.  The Eighth Amendment's subjective requirement of deliberate indifference is a "high legal standard," and a prisoner must establish that the defendant "kn[e]w[] of and disregard[ed] an excessive risk to [his] health and safety."  *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (internal quotation marks and citation omitted).

### 1.  *Objective Standard:  Serious Mental Health Needs*

A sufficiently serious medical need exists if failure to treat his injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part*

*on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "A heightened suicide risk or an attempted suicide risk is a serious medical need. *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cit. 2010), *vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

Defendants argue that Plaintiff, at most, had a "generalized suicide risk, rather than the "heightened suicide risk" required to establish a serious medical need." (Defs. Memo P&As at 17, citing *Conn*, 591 F.3d at 1095.) Specifically, Defendants contend that Plaintiff only told Defendants that he was suicidal when his "clinical team informed him he was being discharged to a lower level of mental health care." (*Id.* at 18.)

Dr. Moreno attests that he met with Plaintiff on April 3, 2018, and found Plaintiff to be "engaging in coping skills for improved mood," and "exhibited future-forward thinking" and thus, informed Plaintiff that he would be "discharged to CCCMS the next day." (Moreno Decl. at ¶ 30.) Later that night, Plaintiff informed a nurse that he had "intermittent suicidal ideation." (*Id.* at ¶ 31.) Dr. Moreno later performed a "Suicide Risk and Self-Harm Evaluation" wherein he found Plaintiff's "self-reported suicide attempt on March 24, 2018, to be "inconsistent." (*Id*. at ¶ 33.) Dr. Moreno noted Plaintiff was "more agitated that he was being discharged than exhibiting an effect more akin to someone with suicidal ideations." (*Id*.) Based on his observations, Dr. Moreno "concluded that [Plaintiff] presented a moderate risk of suicidality" and his "reported desire to engage in self-harm was conditional based on his housing placement and level of mental health care treatment." (*Id*. at ¶ 34, 36.)

Dr. Calderon attests that he examined Plaintiff on numerous occasions and was part of his IDTT. When Dr. Calderon met with Plaintiff on April 10, 2018, he reported that Plaintiff's reports as to the status of his mental health were "vague and he appeared to be exaggerating his symptoms." (Calderon Decl. at ¶ 27.) On many occasions that Dr. Calderon met with Plaintiff, other mental health staff documented no reports by Plaintiff of suicidal ideation or exhibiting any suicidal or self-harming behavior. (*See id.* at ¶¶ 31-34.) On April 18, 2018, Dr. Calderon met with Plaintiff and informed him "he would be

discharged from crisis bed on April 19, 2018.  (*Id*. at ¶ 38.)  On April 19, 2018, Plaintiff "informed staff that he had cut himself."  (*Id*. at ¶ 40.)  Plaintiff informed staff that "he did not want to die, but that he was frustrated with his treatment team because he did not want to be discharged and wanted to be treated at the EOP level of care."  (*Id*.)  From this information, Dr. Calderon determined that "this was not a suicide attempt because the cuts were superficial."  (*Id*.)  "Based on [Plaintiff's] presentation, his history, and [mental-health records," Dr. Calderon concluded that Plaintiff's "desire to engage in self-harm was conditional based on his housing placement and level of mental health care treatment."  (*Id*. at ¶ 46.)

Plaintiff claims in Opposition that he did attempt suicide by "pulling the chord on my neck" but he stopped pulling before his "cellie woke up" causing him to think about suicide "[two] more times but didn't do it."  (Opp'n at 3.)  In addition, he argues that there are statements documented by Defendants and made by Plaintiff that he was having suicidal ideation on multiple occasions.  While Defendants do contest Plaintiff's credibility, and Plaintiff's statements as to his suicide attempts are far from consistent, the Court finds that there is evidence in the record that there is a triable issue of material fact as to whether Plaintiff suffered from a serious medical need.

However, for the reasons set forth below, the Court finds there is no triable issue of material fact as to whether Dr. Moreno or Dr. Calderon were deliberately indifferent to those serious medical needs.

### 2.    *Subjective Standard:  Deliberate Indifference*

Deliberate inference "requires more than ordinary lack of due care."  *Farmer v. Brennan*, 511 U.S. 825, 835, (1994) (internal quotation marks omitted) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  (*Id.* at 837.)  Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown

by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

"In deciding whether there has been deliberate indifference to a prisoner's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals— concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta*, 744 F.3d at 1076)); *accord Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021).

Dr. Moreno treated Plaintiff from his first MHCB stay from March 24 to April 4, 2018. (*See* Moreno Decl. at ¶¶ 14, 22, 23, 25, 30, 32.) Dr. Calderon treated Plaintiff from April 9, 2018, to April 19, 2018. (*See* Calderon Decl. at ¶¶ 23, 27, 29, 31-32.) Plaintiff claims "both were aware that I didn't have a passive, moderate suicidal ideation" but rather he had "acute suicidality." (Opp'n at 17.) He claims they were both deliberately indifferent to his serious mental health needs because he "told them daily that [he] thinks of suicide but unable to act due to [having] been in MCHB where there's no tools and [he is] under watch 24/7." (*Id.*) He claims that their recommendations that he be placed in a lower level of care is evidence of their deliberate indifference. (*See id.*)

However, the undisputed evidence in the record shows Arellano has an extensive and well documented medical history for these timeframes which shows he was continually treated by prison psychologists, psychiatrists, nurses, and other mental health staff for his mental health issues. It is undisputed that Plaintiff underwent comprehensive suicide risk evaluations and his condition was discussed by teams of mental health professionals. Dr.

Moreno attests that there "was no change in Arellano's clinical presentation between March 24, 2018, and April 4, 2018, that would suggest there was an increased risk of suicidality." (Moreno Decl. at ¶ 38.)  Dr. Moreno concluded that that Plaintiff "did not express a genuine desire to die during my assessments or visits with him" and opines that Plaintiff "reported increased suicidality after learning he would be discharged from the MHCB to protest his return to his housing unit at the CCCMS level of mental health care." (*Id.*)  Thus, it was the opinion of Dr. Moreno that Plaintiff should be returned to the CCCMS level of care "because it was clinically inappropriate to recommend a higher level of care at that time." (*Id.*)

Dr. Calderon attests that "[b]ased on Arellano's presentation, his history, and [his mental health records], [he] concluded that Arellano's reported desire to engage in self-harm was conditional based on his housing placement and level of mental health care treatment." (Calderon Decl. at ¶ 46.)  In Dr. Calderon's opinion, Plaintiff exhibited "maladaptive behavior" which led to his recommendation that Plaintiff "be returned to regular housing following his MHCB stay from April 4, 2018 to April 19, 2018." (*Id.* at ¶ 48.)  Moreover, it was his professional opinion that Plaintiff "did not express a genuine desire to die during my assessments or visits with him" and this opinion was also based on Plaintiff's "clinical presentation, the evaluations by other clinicians, his IDTT, the conclusion of the case conference, and Arellano's repeated comments about the EOP level of mental health care." (*Id.*)

Plaintiff attempts to raise a triable issue of fact by claiming throughout his Opposition that Dr. Moreno and Dr. Calderon purposefully did not document Plaintiff's claims to them that he was feeling suicidal.  Plaintiff argues that neither Dr. Moreno nor Dr. Calderon had "any evidence strong enough to justify why they believe I should be sent to CCCMS." (Opp'n at 12.)  He claims it is "evident Dr. Calderon and all the team are liars, making misleading and prejudicial reports, putting life at risk." (*Id.* at 19.)  Plaintiff argues throughout his Opposition that Dr. Moreno and Dr. Calderon purposefully did not document Plaintiff's claims to them that he was feeling suicidal.  Plaintiff argues that

neither Dr. Moreno nor Dr. Calderon had "any evidence strong enough to justify why they believe I should be sent to CCCMS." (Opp'n at 12.)  He claims it is "evident Dr. Calderon and all the team are liars, making misleading and prejudicial reports, putting life at risk." (*Id.* at 19.)

Plaintiff does not dispute that he was examined by Defendants and many other prison personnel or given examinations to assess his suicidal risk.  While Plaintiff repeatedly insisted that he was entitled to a higher level of care, Plaintiff is not a medical expert, and his unsupported lay opinion is insufficient as a matter of law to establish a genuine factual dispute.  *See Estelle*, 429 U.S. at 93 (stating that the question whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Vasquez v. Cnty. of Santa Clara*, 803 F.App'x 100, 102 (9th Cir. 2020) (affirming summary-judgment decision finding no deliberate indifference when defendant, "the last mental health professional to evaluate [the decedent] before his suicide," "reviewed [his] medical records, consulted with the officer on duty, observed and conversed with [him], and, in his professional opinion, determined that [he] was not suicidal."); *see also Valdez v. Zhang*, No. 20-cv-0736-JLS-WVG,  2023 WL 2657626, at *7 (S.D. Cal. Mar. 27, 2023) (Plaintiff failing to "offer any evidence whatsoever that [his doctor's] clinical assessments and recommendations deviated from prevailing standards of care" defeats any finding of  deliberate indifference to an "excessive risk to plaintiff's health.").

Here, the medical records before the Court establish that treatment provided to Arellano medically appropriate under the circumstances.  *See Toguchi*, 391 F.3d at 1058; *Jackson*, 90 F.3d at 332.  Arellano disagrees, but his lay opinion alone, unsupported by any "particular parts of materials in the record, including depositions, documents, … affidavits or declarations, stipulations, … admissions, interrogatory answers," or other admissible evidence which corroborates his conclusion or reasonably tends to show that Dr. Moreno or Dr. Calderon chose any particular course of treatment with conscious disregard of his needs, is insufficient to establish a genuine dispute.  Fed. R. Civ. P. 56(c)(1)(A); *Rivera v.*

*Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.")

Based on the record before it, this Court finds no jury could reasonably conclude that any named Defendant acted with deliberate indifference to Arellano's claims of serious mental health needs.  Accordingly, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiff's Eighth Amendment claims.

### B.    Qualified Immunity

Finally, Defendants claim that they are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims.  (*See* Defs.' P&As at 24.)  On summary judgment, courts generally resolve questions of qualified immunity through a two-pronged inquiry.  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  The first prong "asks whether the facts, '[t]aken in light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The second prong "asks whether the right in question was 'clearly established' at the time of the violation."  *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016).  The court is not required to address the prongs in any particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

However, where, as is the case here with respect to Arellano's Eighth Amendment claims, "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").  Because the Court has found no genuine dispute with regard to Plaintiff's Eighth

Amendment deliberate indifference to serious medical needs against Defendants, it need not also decide whether they would be entitled to qualified immunity.

## IV. Conclusion and Order

For the reasons stated above, the Court **GRANTS** Defendants Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 29) and **DIRECTS** the Clerk of the Court to enter a final judgment in favor of Defendants on all claims and to **CLOSE** the file.

**IT IS SO ORDERED**.

Dated:  March 18, 2024

Honorable Todd W. Robinson
United States District Judge